Walter DUDO

v.

Charles J. SCHAFFER, Jr., Richard W. Cutaiar, William Lemon, Vincent Dagen, Maurice R. Schurr, William J. Gormley, Joseph Cimino, Teamsters Pension Trust Fund of Philadelphia and Vicinity, Highway Truck Drivers & Helpers Local No. 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Teamsters Joint Council No. 53, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America.

Civ. A. No. 78–467.

United States District Court, E. D. Pennsylvania.

Aug. 10, 1981.

See also, 82 F.R.D. 695.

---

Lewis Kates, E. Lawrence Hannaway, Philadelphia, Pa., for plaintiff.

William Einhorn, Philadelphia, Pa., for defendant Local 107.

James Leyden, Nicholas Price, Philadelphia, Pa., for defendant trust fund.

## OPINION

LUONGO, District Judge.

This is an action brought under § 302(c)(5) of the Labor Management Rela-

tions Act, 29 U.S.C. § 186(c)(5), by a former member of the Teamsters Union who was denied pension benefits from the Teamsters Pension Trust Fund of Philadelphia and Vicinity, on the ground that he had a break in service with employers participating in the union pension plan. The remaining defendants are the pension trust fund, its trustees, and Local No. 107 of the Teamsters, of which Dudo was a member.[1] Currently before the court is a motion for summary judgment by Local 107, and Dudo's re-submitted motion for certification of this action as a class action.

Dudo's claims are set forth in detail in my earlier opinion in this case, 82 F.R.D. 695 (E.D.Pa.1979). Briefly stated, Dudo's claim is that none of the trustees of the pension trust warned him of the effect of the break in service provision, with the result that he accepted a non-covered job which ultimately led to the denial of pension benefits. Under the rules governing the pension trust, any union member who is employed for longer than 156 consecutive weeks in a job for which the employer is not making a contribution to the pension trust, is considered to have a break in service, and loses credit for any time he accumulated before taking the non-covered job. In Dudo's case, he worked in a non-covered job for slightly more than three years, and as a result lost credit for 19½ years of prior service, with the further result that he failed to qualify for any pension whatsoever. Dudo contends that the failure of the trustees to guard against such occurrences in their administration of the pension trust constitutes a "structural violation" of § 302 of the Act, which provides that union pension trust funds must operate "for the sole and exclusive benefit of the employees of such employer and their families and dependents." Dudo's claim against Local 107 is grounded upon his contention that Raymond Cohen, president of the local at the time Dudo's break in service occurred, and

formerly a trustee of the pension trust, failed to warn Dudo of the hazards of accepting non-covered employment. Dudo also charges that Cohen erroneously advised him to accept a job which had been offered to him, advising that it would enable him to accumulate pension benefits, when in fact acceptance of that job, which was non-covered employment, resulted in Dudo's disqualification from pension benefits.

## I. *Local 107's Motion*

Local 107 moves for summary judgment on two grounds. Its principal argument in support of its motion is that Dudo has failed to create a material issue of fact with regard to breach of fiduciary duty by the union. Dudo's deposition has been taken in this action, and he was questioned specifically about the events which led up to his taking a job not covered by the pension fund. As Local 107 points out, it is clear from Dudo's deposition that local president Raymond Cohen did not procure for Dudo the job which resulted in Dudo's break in service, and did not discuss with Dudo the effect upon Dudo's pension rights of taking the job. In response to questions from counsel for Local 107, Dudo testified that in 1964 he approached Cohen seeking either a disability pension, or an over-the-road driving job which would not involve numerous deliveries.[2] Cohen informed him that he could not get a disability pension, and that no over-the-road jobs were then available, after which Dudo, on his own initiative, found a job with Charles Benjamin, Inc., a trucking firm. When Dudo informed Cohen of his chance for the job with Benjamin, Cohen advised Dudo to accept it because there were no driving jobs available. Dudo further testified that he and Cohen did not discuss the effect of his taking this particular job, which turned out to be that of watchman, on Dudo's pension rights. (Deposition of Walter Dudo, August 22, 1979, pp. 15–19).

1. The International Brotherhood of Teamsters, and Teamsters Joint Council No. 53 have been dismissed from this action.

2. Dudo had some impairment in his lower back which made it difficult for him to perform the

bending and stooping associated with local delivery work. By his own admission, however, he was capable of driving a truck over a longer run which did not require constant stops for unloading.

Later in the deposition, in response to questioning by his own counsel, Dudo repeated his earlier testimony that local president Cohen never discussed pension rights with him. (Dudo deposition, pp. 44–45). Upon further examination by counsel for Local 107, Dudo again reiterated his testimony that he had no discussion with Cohen about pensions. (Dudo deposition, p. 46). Finally, in response to further questioning by his own counsel, Dudo testified that he had no discussions with Cohen or any representative of Local 107 on the specific subject of disability pensions. (Dudo deposition, p. 50).

In response to Local 107's motion for summary judgment, plaintiff did not present any further evidence tending to create an issue of fact with respect to Dudo's individual claim, but rather took the position that there were outstanding issues of fact with respect to the overall administration of the pension trust which had yet to be resolved as part of the discovery on the class action issues. (Memorandum of Law in Opposition to Local 107's Motion for Summary Judgment, Doc. # 75, p. 11). At oral argument on the motion, in response to questions from the court about the specific allegations comprising Dudo's individual claim, counsel for Dudo took the position that Dudo's deposition testimony created material issues of fact regarding the advice given to Dudo by union officials, but he could not cite to any specific portion of the deposition in support of this contention. (Transcript of Argument, June 8, 1981, pp. 8–13). Counsel then sought leave to submit an affidavit from Dudo to "supplement" Dudo's deposition testimony. Defense counsel objected, noting that Dudo had read and signed the deposition, and had made some changes in it without altering his testimony about his dealing with Cohen. (*Id.*, p. 14). I also expressed doubts about the propriety of a supplemental affidavit. (*Id.*, p. 9).

Ten days after argument on the motion, Dudo submitted a supplemental affidavit which contradicts some of his deposition testimony. The affidavit states in part:

¶ 7. Following my accident, I inquired about the possibility of obtaining a disability pension but was advised by Raymond Cohen, the President of Local 107 and a trustee of the Plan that this was not possible. Rather, he advised me to accept employment with Charles Benjamin, Inc. as a watchman in order to accumulate benefits under the Plan and, when eligible, to obtain increased benefits as a normal retiree.

¶ 9. In reliance upon the representation that my employment with Charles Benjamin, Inc. would be employment which would accumulate monies toward my pension, I did not take an early disability pension but accepted the offered employment in early 1964 and continued to work for Charles Benjamin, Inc. until 1967.

The threshold issue in resolving Local 107's motion is whether any consideration should be given to Dudo's "supplemental" affidavit, or whether he should be bound by his testimony at deposition. There is a split of authority over whether a district court may, upon a motion for summary judgment, exclude from consideration an affidavit which is in conflict with the affiant's deposition. In *Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572 (2d Cir. 1969), the court held that it was proper for the district court to disregard an affidavit which contradicted deposition testimony. In *Perma*, the plaintiff contended that he was defrauded by the defendants. During lengthy questioning at deposition, he was unable to point to any specific conduct by the defendants in support of his allegations of fraud. After the defendants moved for summary judgment, the plaintiff then made, in an affidavit, specific averments of fraud which he had failed to make at deposition. 410 F.2d at 576–78. The court noted that there was ample time for direct and cross-examination during the deposition, and the plaintiff had failed to testify to any facts in support of his claim. 410 F.2d at 578. It also noted that the plaintiff could not claim that there was newly discovered evidence, because the evidence in question consisted of conversations to which the

plaintiff was a party. *Id.* The court reasoned that the purpose of summary judgment, to determine " 'whether one side has no real support for its version of the facts,' " would be frustrated if a party could avoid summary judgment simply by submitting an affidavit which on its face was inconsistent with the party's deposition testimony.

In contrast to the view expressed by the Second Circuit, two district courts have held it proper to consider affidavits which were inconsistent with deposition testimony. In *Guarantee Insurance Agency Co. v. Mid-Continental Realty Corp.*, 57 F.R.D. 555 (N.D.Ill.1972), a suit in which the plaintiffs sought to recover for securities fraud, a material issue was the date on which certain newspaper articles relevant to a securities prospectus were published. One of the plaintiff's witnesses testified to one date of publication at deposition, and a different date in his affidavit. The court held that it was a matter of credibility which date was accurate, and refused to rule on the issue on a motion for summary judgment. 57 F.R.D. at 563.

In an earlier case, *United States v. Johns-Manville Corp.*, 259 F.Supp. 440 (E.D.Pa. 1966), the government sought to enjoin alleged violations of the antitrust laws. The defendant moved for summary judgment, and in support of its motion submitted an affidavit of an employee setting forth his role in development of a particular kind of pipe. Certain of the statements in the affidavit were contradictory to the employee's deposition testimony, and the government moved to strike the contradictory portions from the affidavit. The court denied the motion, holding that the affidavit was properly considered, although the deposition testimony was entitled to more weight. 259 F.Supp. at 456.

Professor Moore also argues for the position that a contradictory affidavit should not be excluded from consideration.

> The deposition of a witness will usually be more reliable than his affidavit, since the deponent was either cross-examined by opposing counsel, or at least available to opposing counsel for cross-examination. Nevertheless, if a witness has made an affidavit and his deposition has also been taken or if he had made two affidavits, and the two in some way conflict, the court may not exclude the affidavit from consideration in the determination of the question whether there is any genuine issue as to any material fact.

6 Moore, Federal Practice, ¶ 56.22[1], pp. 1325–26 (1980).

In my view, there can be no absolute rule as to when it is proper for the district court to exclude from consideration an affidavit which contradicts earlier deposition testimony. Rather, the decision whether to exclude from consideration such an affidavit should rest within the sound discretion of the district court, taking into account all of the facts and circumstances under which the affidavit is offered.

Here, several considerations lead me to the conclusion that Dudo's supplemental affidavit should not count in the determination of whether there is a material issue of fact for trial. First, consideration must be given to *when* the affidavit is filed. Rule 56(c), F.R.Civ.P., provides that "[t]he adverse party *prior to the day of hearing* may serve opposing affidavits." (Emphasis supplied.) In this case, unlike the affidavits submitted in the cases cited above, Dudo's affidavit was not submitted at the same time as his brief in opposition to the motion for summary judgment, but *after* hearing and argument on the motion. Significantly, at argument both opposing counsel and the court had pinpointed the inadequacies of Dudo's testimony, and the court had made plain that there was a substantial risk of summary judgment being entered against Dudo. Had Dudo's affidavit been submitted prior to hearing on Local 107's motion, I would have been more inclined to give some weight to it. By neglecting to submit any evidentiary materials until after argument, however, Dudo not only failed to carry his burden diligently to contest the motion, *see* 6 Moore, Federal Practice, ¶ 56.22[2], p. 56–1341 (1980), he seriously undermined whatever credibility a contra-

dictory affidavit might have. In this regard, I note that the factual matter set forth in Dudo's affidavit was not newly discovered material which could not have been presented prior to argument. It would arguably be proper to submit a supplemental affidavit for newly discovered matter. In the instant case, all of the information in Dudo's affidavit was within his knowledge as of the date of filing the complaint and as of the time of his deposition. *See Perma Research, supra*, 410 F.2d at 578.

Second, it is important whether the deposition was signed. Rule 30(e), F.R.Civ.P. Here, the parties did not waive signing of the deposition, and Dudo read and signed the transcript of his testimony. Significantly, Dudo made two changes in his testimony after reading the transcript, but he made no changes in those portions of his testimony dealing with his conversations with Raymond Cohen or other officials of Local 107.

Third, the nature and extent of the conflict between the deposition and the affidavit is relevant in determining whether to exclude the affidavit. Where the conflict between the two is relatively minor, or can be attributed to confusion or uncertain memory, the conflict simply raises issues of accuracy and credibility which render summary judgment inappropriate. *E. g., Guarantee Insurance, supra; United States v. Johns-Manville, supra*. Where, however, the contradiction is not minor, but goes to a central issue of the case which was the subject of repeated questioning at deposition, there is little reason to believe that the live testimony of a party-witness is mistaken, or that a subsequent affidavit creates a *genuine* issue of fact. Here, Dudo had repeated opportunities to testify on the record as to his discussions with Raymond Cohen and other Local 107 officials, and his testimony was clear that Cohen did not induce him to take a non-covered job, and did not discuss pension rights with him. I agree with the Second Circuit in *Perma Research, supra*, that no purpose is served by permitting a party to submit a contradictory affidavit on a crucial issue in the case when he

did not avail himself of the earlier opportunities to set forth the evidence in support of his claim when he was testifying and was subject to cross-examination.

Finally, the content of the affidavit is relevant in determining whether to consider it. Here, it is noteworthy that Dudo's affidavit offers no explanation for the contradiction between it and the deposition, and in fact makes no reference to the deposition whatsoever. Where the conflict between the affidavit and deposition testimony is so blatant, at a minimum the affiant should be expected to advance some explanation, *e. g.*, confusion, lapse of memory, for the discrepancy. It is also significant that the crucial paragraphs in Dudo's affidavit are not "testimonial" in the sense that they express Dudo's version of the events described in his own words, but instead track almost *verbatim* the language of Dudo's complaint. *See* Complaint, Doc. # 1, ¶¶ 11–12. In short, on its face the affidavit seems to be little more than an attempt to avoid summary judgment by restating, in affidavit form, the crucial allegations from Dudo's complaint. When the basis for those allegations has been probed on deposition, and found lacking, little is added by the party's subsequent affirmation of the complaint.

In summary, after weighing the circumstances under which Dudo's affidavit has been offered, and after considering the content of the affidavit, I conclude that it would not be proper to consider it in deciding whether there is a material issue of fact for trial.

■ Turning then to the record as it stands in the absence of Dudo's belated affidavit, it is plain that Local 107 is entitled to summary judgment on Dudo's claim that local president Raymond Cohen by misrepresentation, induced Dudo to take a non-covered job which resulted in Dudo's break in service. As noted above, the subject of Dudo's conversations with Cohen was probed in depth at Dudo's deposition, and Dudo plainly had no discussions with Cohen about the effect of his taking a watchman's job on his pension rights. At a second

argument on the motion for summary judgment, at which I gave counsel the opportunity to address the impact of Dudo's supplemental affidavit, counsel took the position that even if the affidavit is excluded from consideration, there is a material issue of fact created by a particular portion of Dudo's deposition testimony. Specifically, counsel relies upon Dudo's testimony that in his initial conversation with Cohen, Dudo "asked him if I could go on disability or something like that." (Dudo deposition, p. 44). Counsel suggests that the phrase "something like that" could relate to discussions relevant to the break-in-service provision. There is no merit to this suggestion. When Dudo went to Cohen and asked him about disability pensions Cohen could not have induced Dudo to accept the non-covered job, because at that time Dudo had not yet even begun to look for an interim job to tide him over until an over-the-road job became available. It was only in later conversations, after Dudo accepted the job with Benjamin that Cohen could have given Dudo advice resulting in a break in service. More importantly, when specifically asked about the break-in-service provision, Dudo repeatedly testified that it was not discussed. In view of the specific testimony on this subject, counsel's reliance on the cryptic phrase "or something like that" simply does not suffice to create a material issue of fact.

Since I have concluded that Dudo has not presented a material issue of fact as to whether he was induced by any official of Local 107 to take a non-covered job, the only remaining issue is whether Local 107 can be liable for failure to warn Dudo of the effect of taking a non-covered job on his pension rights under the break in service rules governing the plan. On this claim, Local 107 moves for summary judgment on the ground that Dudo has not raised a material issue of fact regarding the union's purported fiduciary duty to advise him about his rights under the pension plan.

▪ Dudo contends that the failure to warn him is a structural defect in the pension trust fund in violation of § 302(c)(5) for which Local 107 can be held liable. I agree with Dudo that improper administration of a pension trust can rise to the level of a structural defect in the plan. E. g., Porter v. Teamsters' Health, Welfare & Life Insurance Funds of Philadelphia, 321 F.Supp. 101 (E.D.Pa.1970). I also agree with Dudo that a union may be held liable for structural defects or breach of fiduciary duty in the administration of a pension trust. Nedd v. United Mineworkers of America, 556 F.2d 190 (3d Cir. 1977), cert. denied, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 757 (1978). The issue presented by Local 107's motion, however, is whether Dudo can present the degree of evidence necessary to establish liability on the part of the union.

In Nedd, pensioned coal miners sued their union and union pension trust fund alleging a breach of fiduciary duty for their joint failure to enforce a contractual obligation on the part of coal mine owners to pay a tonnage royalty on coal mined to the pension trust fund. The complaint alleged that the union sought to favor working miners over retired miners by easing the financial burdens of mine owners by not collecting the royalty, thereby creating more work for the active miners.

The district court held that the union, as distinct from the pension trust itself, could be held liable for breach of fiduciary duty because it was so intimately involved in the affairs of the pension trust that it could be said to have dominated the affairs of the fund. The Court of Appeals affirmed, on the theory that the union's extensive involvements made it a de facto trustee. 556 F.2d at 209. The court noted that two out of three of the fund's trustees were officers of the union; that the fund's offices were moved to the same location as the union's offices; and, most importantly, that the trustees of the fund had in effect delegated responsibility to the union for ensuring that royalties were collected from the mine owners. Under these circumstances, the court ruled, the union could be held to the same standard as a trustee, because it had assumed a fiduciary duty in administration of the fund.

In the instant case, therefore, in order to hold Local 107 liable for alleged structural defects in the pension trust plan, Dudo must establish that Local 107 was so involved in the affairs of the trust that it should be held to the standard of a *de facto* trustee.

In support of its motion, Local 107 has submitted the affidavit of Kenneth Moore, Secretary-Treasurer of the local, who avers that the pension trust fund is a separate entity created by agreement between an employers' association of trucking firms and seven local Teamsters unions. Moore further avers that the fund is administered exclusively by its board of six trustees, and that Local 107 chooses only one of the trustees. Finally, Moore avers that Local 107 played no role in the formulation or administration of the break in service rule, and no role in ruling upon Dudo's application for a pension.

█ Dudo's sole response to the affidavit filed by Local 107, aside from the affidavit which I have discounted, is his counsel's affidavit that further information about the union's alleged "administration" of the break in service rule might be forthcoming in answers to questionnaires sent to union members in connection with the class action aspects of the case. An attorney's affidavit stating what he hopes to be able to prove at trial is an insufficient response to a motion for summary judgment. *King v. National Industries, Inc.*, 512 F.2d 29 (6th Cir. 1975); *Mercantile National Bank at Dallas v. Franklin Life Insurance Co.*, 248 F.2d 57 (5th Cir. 1957). Furthermore, where a party has moved for summary judgment, and supported its motion by affidavit, and the motion is not opposed by properly submitted affidavits setting forth a material issue of fact, entry of summary judgment is appropriate. *Tunnell v. Wiley*, 514 F.2d 971 (3d Cir. 1975); *Boulware v. Parker*, 457 F.2d 450 (3d Cir. 1972). Accordingly, because there is nothing in the record which would support a finding that Local 107 was so deeply involved in pension trust affairs as to be a *de facto* trustee under *Nedd v. United Mineworkers*, Local 107's motion for summary judgment on count II of Dudo's complaint will be granted.

In count III of his complaint, Dudo has also raised a pendent claim under Pennsylvania law, on the theory that Local 107 is estopped from denying him pension benefits because its officers induced him to take a non-covered job and failed to warn him of the adverse effects of doing so. As Local 107 points out, the factual basis for this count is the same as for count II. Therefore, since, as noted above, there is no factual issue with respect to Dudo's allegations of inducement or fiduciary duty, summary judgment will be granted on count III as well.

## II. *Dudo's Resubmitted Motion for Class Action Certification*

On February 27, 1979, Dudo filed a motion to certify this action as a class action. After hearing argument on the motion, on June 12, 1979, I entered an order denying the motion for class action certification, without prejudice to resubmission upon an expanded record. In a memorandum opinion issued with the order, I set forth my reason for denying certification at that time, namely that Dudo had failed to establish how many of the putative class members had forfeited their pension benefits due to breaks in service that were "involuntary" or "induced" by union or fund representatives, and therefore he had not met the numerosity requirement of Rule 23(a)(1), F.R.Civ.P. *Dudo v. Schaffer, supra*, 82 F.R.D. 695.

Dudo then commenced discovery directed to the class certification issue. In an order dated February 26, 1980, I directed the pension fund to provide counsel for Dudo the names and addresses of Teamsters' members who had been denied pension benefits because of breaks in service, and approved a form of notice and questionnaire to be sent to prospective class members seeking information about the circumstances under which they suffered a break in service. After further conferences between counsel, with the participation of the court, two mailings were sent. Prospective class members in the first mailing were instructed to

reply by April 30, 1980, and those in the second mailing by July 1, 1980. From the time when the second mailing was sent, in June 1980, until June 18, 1981, when Dudo re-submitted his motion for class certification, he took no action with respect to the class aspects of this litigation, and no action with respect to his individual claim other than to oppose Local 107's motion for summary judgment. The pension trust fund and its trustees oppose class certification on a variety of grounds, and I agree that the motion to certify should be denied.

■ First, the re-submitted motion is untimely. As noted above, Dudo's counsel has allowed almost one year to pass between the deadline for receiving answers to questionnaires and the date is re-submitted the motion for class certification. Under Local Rule 27(c), Local Rules of the United States District Court for the Eastern District of Pennsylvania, the plaintiff must move within 90 days of the filing of a complaint for certification of the action as a class action. Local Rule 27(c) does not literally apply to the facts of this case, because the motion is a re-submitted one. The spirit of Local Rule 27 is clear, however, and there is no question but that an unexplained delay of 11½ months in moving for class certification after class action discovery was complete, violates the spirit of the rule.

■ The failure of plaintiff's counsel timely to re-submit the motion for certification also bears upon the adequacy of Dudo as a class representative. As the Supreme Court noted in *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 405, 97 S.Ct. 1891, 1897, 52 L.Ed.2d 453 (1977), "the named plaintiffs' failure to protect the interest of class members by moving for certification surely bears strongly on the representation that those class members might expect to receive." *Accord, Danner v. Phillips Petroleum Co.*, 447 F.2d 159 (5th Cir. 1971); *Beasley v. Kroehler Manufacturing Co.*, 406 F.Supp. 926 (N.D. Tex. 1976); *Walker v. Columbia University*, 62 F.R.D. 63 (S.D.N.Y. 1973). In the instant case concern over the adequacy of representation is particularly acute, because the statute of limitations on putative class members' claims resumed running on June 12, 1979, when I denied the motion for class certification, *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). If the defendants are correct that a two-year statute of limitations governs this action, which was filed on February 13, 1978, all of the class members' claims may now possibly be barred.

Significantly, Dudo's counsel offers no explanation for his delay in pursuing the class aspects of the litigation, other than that the attorney in his office who had handled much of this litigation is no longer with the firm. At another point in his re-submitted motion, counsel alludes to the fact that this case was placed in a suspense status. However, as the pension trust fund defendants note in their brief opposing certification, this case was placed in a suspense status early in the litigation, and was removed therefrom on December 29, 1978, before Dudo had even filed his original motion for class certification. In effect, therefore, counsel has offered no explanation for the failure to proceed with the class aspects of the case.

In my view, denial of the motion for certification would be justified solely for the reasons stated above. There are, however, additional reasons for denying the motion. Although Dudo has had ample opportunity for discovery, and received answers to questionnaires from 123 Teamsters members who were denied pension benefits, in whole or in part, because of the break-in-service provision, he has not made a showing on the record that his claim is typical of those of the class he purports to represent, or that there is a sufficient number of similar claims to warrant class action treatment.

The class which Dudo wishes to certify is a class of Teamsters members who were denied pension benefits because of "involuntary" or "induced" breaks in service. As I noted in my earlier opinion in this case, 82 F.R.D. at 698–700, whether this is a sufficiently well-defined class to permit certification depends upon whether the specific

circumstances under which the breaks in service occurred are similar for all of the members of the class. The purpose in permitting Dudo to send a questionnaire to prospective class members was to permit them to describe, in their own words, the facts surrounding their break in service.

In re-submitting his motion for class certification, Dudo has failed to make the requisite factual showing that there are similar claims among class members, and that his claim is typical of the class. As the pension trust fund points out, Dudo has established virtually no factual support for his claim that Teamsters members suffered from similar involuntary or induced breaks in service, because he has neither submitted the responses to the questionnaires nor adequately described or summarized the content of the responses. Rather, Dudo relies upon the conclusory affidavit of his counsel, who states that out of 123 responses to the 210 questionnaires mailed, he believes that 107 should be class members. Counsel avers that 15 respondents had some form of disability which prevented them from continuing with their employment; 23 respondents had an involuntary break in service because of "individual circumstances" such as lack of union employment, illness, or internal union politics; and 69 respondents had a break in service because of "improper activities" by union officials.

By submitting only a summary affidavit by counsel, Dudo has scarcely created the "expanded factual record" which I indicated would be necessary for disposition of the class action motion. The inadequacy of the affidavit is graphically illustrated by the original questionnaire responses submitted by the pension trust fund in opposition to the motion, because, as the defendants point out, there is no support for Dudo's position in many of the responses. For example, the following reasons for termination were given by Teamsters listed by Dudo's counsel as potential class members:

Mr. Aronofsky stated that he became an "owner operator" in 1957 (*see* Exhibit E, Defendant, Pension Fund's Brief in Opposition to Motion for Class Action Certifica-

tion); Mr. Craig took over his father-in-law's trucking business (Exhibit F); Mr. Straff "left the Teamsters to try a business venture" (Exhibit G); Mr. Dluzniewski "left to become and [*sic*] independent trucker; bought a P.U.C. and became Edward Dean Trucking Company. Did not pay in for myself, however" (Exhibit H, p. 2); Mr. Pizzico joined the Operating Engineers because "it was more money" (Exhibit I); Mr. Roselli accepted an offer of a promotion to "store manager" (Exhibit J); Mr. Strickland "quit working for Capecci in April, 1970)," worked one year for Eastern, then "move[d] to North Carolina to go into business for myself" (Exhibit K, p. 2); Mr. Dagney "became a supervisor and therefore no longer belonged to the union" (Exhibit L); and Mr. Weir likewise accepted an offer to move into management, but about 10 months later he resigned, "moved to our home in the mountains," "bought a new dump truck and went into business for myself up here" (Exhibit M).

In short, on the record as it now stands, there is nothing to indicate that there is a group of identifiable plaintiffs who were denied pensions for similar reasons, and nothing which reflects that Dudo's claim is representative of the class.

Finally, I note that in re-submitting the motion for class certification, Dudo appears to have shifted his theory of liability, thereby raising further doubts as to the basis for certifying a class. In my earlier opinion, I quoted from Dudo's brief the following description of his theory:

> The plaintiff does not contend that *any* break in employment rule is invalid. To prevail in his claim the plaintiff will prove that the present break in service rule is unreasonable and hence invalid insofar as it causes the forfeiture of prior credited service *even where the break is involuntary or was induced by the Union and the [Trust Fund]*.

82 F.R.D. at 698.

In arguing that there is an issue of liability that can best be resolved on a class-wide basis, Dudo now takes the position that the break in service provision is void on

its face unless justified by actuarial necessity:

> The liability issue of whether the break in employment provision is arbitrary and capricious will not depend upon individual proof. The question of whether it constitutes a structural defect will be resolved by examining how vital that provision is to the actuarial integrity of the Fund, whether it advances any legitimate policies of promoting employee loyalty to the union, and other such considerations. *See [Knauss] v. Gorman* 583 F.2d 82 (3d Cir. 1978).
> (Plaintiff's Joint Memorandum in Support of (1) Class Action Certification; and (2) Further Discovery, p. 13).

Throughout this litigation I have noted the "shifting sands" in plaintiff's theory of the case. At this stage, well over three years after filing of the complaint, when the plaintiff still cannot state with certainty the precise theory of liability which he is advancing, there is certainly no reason to multiply the confusion by granting class action certification.

In summary, as noted above, the plaintiff bears the burden of establishing, as soon as it is practicable, that a purported class action is properly certifiable under Rule 23, F.R.Civ.P. *Davis v. Romney,* 490 F.2d 1360, 1366 (3d Cir. 1974). Part of his burden in this regard is to identify sufficiently the members of the class. *Giordano v. Radio Corporation of America,* 183 F.2d 558, 561 (3d Cir. 1950). In this case, Dudo delayed unduly in re-submitting the motion for class action certification; failed to establish that there was a class of claimants with claims similar to his; failed to establish that his claim is representative of the class; failed adequately to identify the members of the class and their number; and ultimately failed to identify a theory of liability suitable for class action treatment. Accordingly, Dudo's re-submitted motion for class action certification will be denied.

### III.  *Dudo's Motion for Further Discovery*

Dudo has also moved for leave to conduct further discovery in an attempt to identify potential class members whose pension benefits were merely reduced by the break in service provision, rather than completely denied. In light of my ruling on class action certification, this motion will also be denied.